[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON APPLICATION FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION
In this case we are concerned with an application for a temporary injunction. The function of a temporary injunction is to maintain the status quo if the circumstances so dictate. The criteria used for the granting of a temporary injunction requires a showing of (1) probable success on the merits of the claimant; (2) a balancing of the results which may be caused to one party or the other from the granting of such temporary relief; (3) irreparable injury; and (4) lack of an adequate remedy at law.
By denying the defendants' motion to dismiss this court, acting through Judge O'Neill, found that with reference to the request to enjoin the start up of unit two within the period of April 1st through June 15th, the plaintiff lacked an adequate remedy at law applying an exception to the general requirement of exhaustion of administrative remedies. He found that available administrative remedies would be futile under the circumstances of this case to prevent damage. In the light of this decision by Judge O'Neill it remained for the plaintiffs to prove items no. 1 through 3 of the requirements for a temporary injunction.
Both parties agree that there has been and is entrainment and impingement of winter flounder larvae through the intakes of the Millstone units. Millstone IlI has been in full operation until May 1st and the defendants have expressed their intention to reopen Millstone II as soon as they receive permission.
The plaintiffs called a number of lay witnesses and five employees of the Department of Environmental Protection who are concerned with the regulating of the defendants' activities in the Millstone plants. Through the use of various D.E.P. internal memos, the fact that all parties have been using the same data and that such data had been furnished by the defendants, coupled with the fact that in general the regulation of the defendants' activities is accomplished through a "self monitoring" system, the plaintiffs have sought to make out a case of lax enforcement and a tendency by the State administrators to accept "self serving" data furnished by the defendants. This approach was CT Page 6127 against a backdrop of known violations of the nuclear regulatory regulations and statutes and violations of the Connecticut Statutes and Regulations and testimony by Mr. Plumb, all of which led to a substantial question mark as to the viability of the statistics and the conclusions of the defendants and the administrators of the EPA Regulations. There was however, up to this point, no affirmative testimony which in any way contradicted the data and conclusions from the defendants and the DEP. The case thus far was one of cross-examination. The only affirmative evidence concerning the data and conclusions was that offered by Mr. Gibson. On the basis of his evidence it appeared to the court that the data used by the defendants' might in fact be unreliable. This testimony was, however, not in writing and uncorroborated.
The approach taken by the defendants in this case has been the opposite to that taken by the plaintiffs. The plaintiffs' case has been based on an atmosphere of suspicion, speculation and questions as to the reliability of the data provided by the defendants and accepted by the DEP. The defendants, however, put forth affirmative, solid, authoritative evidence to substantiate their view. The defendants presented Professor Emeritus Salia an international authority who together with Doctor Lorda used Mr. Gibson's approach and showed it to be meaningless. Dr. Salia then went on to show the meaning and use of various models, all of which are available to examination by the public and furnished data for the conclusion of the defendants which is that there has been a general decline of the winter flounder in the general area of Niantic River and Niantic Bay, Long Island Sound and the entire lower New England area. The most important reason for same is over-fishing and while the population of winter flounder larvae varies from year to year, the effect of entrainment is insignificant compared to the effect of over-fishing and natural mortality of winter flounder. Added to the testimony of Dr. Salia was that of Mr. Charles Fredette, who was in charge of writing the 1992 permit, Mr. Fredette brought into perspective the qualifications and broad knowledge and professionalism of the witnesses from the DEP and the extent to which they had taken into consideration the information furnished them as well as their concerns and their final judgment on the various matters that go into putting together a permit and in enforcing the State and Federal Statutes and Regulations. Added to the testimony of Mr. Fredette, was the testimony of Mr. Danila, the person in charge of the sampling which gave rise to the data used by the defendants in their reports to the DEP. Mr. Danila, like Dr. CT Page 6128 Salia is a person of great experience, excellent reputation and substantial background in the field of ecological monitoring. Any question as to the independence of people like Dr. Salia who serve on the advisory committee and any question as to "self serving" testimony furnished by the defendants to the DEP was in the opinion of the court, overcome by the testimony of Mr. Danila.
The testimony of the experts with respect to entrainment and impingement leads the court to the conclusion that although the reopening of Millstone II will cause some slight increase in entrainment in winter flounder larvae during the high spawning season, it will be have a negligible effect on the winter flounder adult population and it will not cause irreparable injury to the Niantic Bay area.
The testimony of Mr. McHale and Mr. Shuckerow as to the tremendous cost caused by the delay requested by the plaintiffs and the balancing of the results which would be caused from the granting of the injunctive relief which would weigh far too heavily upon the defendants relative to the loss because of entrainment leads to the conclusion that the plaintiffs have failed to sustain their burden of proving items 1-3. The court in making these statements is taking into account the fact that unit III will be out of operation from May 1st through the height of the spawning season. In the light of all the evidence adduced at this hearing the court herewith denies the motion for a temporary injunction and dissolves the temporary restraining order.
With respect to the application for a permanent injunction, the same is herewith also denied by the court. The reason for denying the request for a permanent injunction is that the plaintiffs have an adequate remedy at law in the hearings before the DEP. The DEP has the power to remedy any situation which, after consideration, it finds is warranted. In the light of the evidence brought forth in this hearing the court is of the opinion that at any hearing the DEP will have to give considerable thought to the question of impingement in the light of bonuses paid to top executives, saleable assets of the corporations and the fact that even if the bulk of the decline of the winter flounder population is due to over-fishing, some of it could be avoided by building a fish return at Millstone II within a relatively short time (8-9 mos.) at a reasonable cost and thus reduce the adult fish kill and forstall further litigation. Although there is substantial cost and a time element involved, CT Page 6129 the building of a cooling tower or other device does not seem insurmountable, appears to be highly desirable and would forestall both entrainment and impingement over the long run.
Both the motions for a temporary injunction and for a permanent injunction are denied and the temporary restraining order is dissolved.
Robert J. Hale Judge Trial Referee